| | | |
|---|---|---|
| MAINE MEDICAL CENTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:13-cv-00118-JAW |
| | ) | |
| KATHLEEN SEBELIUS, | ) | |
| Secretary of the U.S. Department of | ) | |
| Health and Human Services, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON MOTION AND CROSS-MOTION FOR JUDGMENT ON ADMINISTRATIVE RECORD

In this motion and cross-motion for judgment on the administrative record, Maine Medical Center challenges the final decision of Kathleen Sebelius, Secretary of the United States Department of Health and Human Services, in which she concluded that the hospital was not entitled to reimbursement under the Medicare program for certain claims because it had failed to produce required documentation. The Court concludes that Secretary Sebelius' decision was supported by substantial evidence and was not arbitrary, capricious, an abuse of discretion, or otherwise unsupported by the law. It therefore denies Maine Medical Center's motion and grants the Secretary's cross-motion.

## I. STATEMENT OF FACTS

### A. Procedural History

On April 2, 2013, Maine Medical Center (MMC) filed a complaint, seeking reversal of the administrative decision of Kathleen Sebelius, Secretary of the United

States Department of Health and Human Services (the Secretary). *Compl.* at 1 (ECF No. 1). The Secretary's decision denied MMC Medicare reimbursement for certain "bad debts" arising from unpaid Medicare coinsurance and deductible amounts of patients eligible for both Medicare and Medicaid. *See Admin. R.* at 2-21 ("Decision of the Administrator") (ECF No. 7). The Secretary reasoned that MMC failed to comply with her "must-bill" policy. *Id.*

The Secretary answered on June 6, 2013, generally responding that the administrative decision should be affirmed because it is supported by substantial evidence and is not arbitrary and capricious, based on an abuse of discretion, or otherwise contrary to the law. *Answer* at 4 (ECF No. 9). On August 23, 2013, MMC moved for judgment on the administrative record, seeking reversal of the Secretary's decision. *Mot. for J. on Admin. R. with Incorporated Mem. of Law* (ECF No. 13) (*Pl.'s Mot.*). On September 9, 2013, the Secretary responded and also moved for judgment on the administrative record, asserting that her decision should be affirmed. *Def.'s Mot. and Incorporated Mem. for J. on the Admin. R. and in Opp'n to Pl.'s Mot. for J. on the Admin. R.* (ECF No. 14) (*Def.'s Opp'n*). MMC replied to the Secretary's opposition and cross-motion on October 4, 2013. *Pl.'s Reply to Def.'s Mot. and Incorporated Mem. for J. on the Admin. R.* (ECF No. 16) (*Pl.'s Reply*). The Secretary replied on October 30, 2013.[1] *Def.'s Reply Br.* (ECF No. 21) (*Def.'s Reply*).

---

[1]    On October 17, 2013, the Secretary requested a 14-day extension to file its reply, based on the federal government shutdown in early October, which prohibited certain Department of Health and Human Services attorneys and other employees from working during the shutdown. *Consent Mot. and Incorporated Memo for a 14-day Extension of Time to Reply* (ECF No. 19). The Magistrate

**B.     Statutory and Regulatory Framework**

Enacted in 1965, the Medicare statute establishes a national program of health insurance for the aged and disabled by funding the costs of covered medical care on behalf of eligible individuals.  *See* 42 U.S.C. §§ 1395—1395kkk-1.  The statute sets out that "[t]he Secretary shall prescribe such regulations as may be necessary to carry out the administration" of Medicare."  42 U.S.C. 1395hh(a)(1).  Pursuant to the Secretary's delegation, the Administrator of the Centers for Medicare & Medicaid Services (CMS)—a sub-agency within DHHS—carries out these responsibilities and administers the Medicare program.  *Central Maine Med. Ctr. v. Leavitt*, 552 F. Supp. 2d 50, 53 (D. Me. 2008); *United States v. White*, 492 F.3d 380, 387 (6th Cir. 2007).

When treating a Medicare beneficiary, a participating provider generally collects coinsurance and/or deductible payments from the patient and then seeks reimbursement of its remaining costs through Medicare by filing an annual cost report.  *See Grossmont Hosp. Corp. v. Sebelius*, 903 F. Supp. 2d 38, 43 (D.D.C. 2012).  Providers file these annual reports with private insurance companies, referred to as fiscal intermediaries, whom CMS has tasked with performing various administrative functions under Medicare, including "[d]etermining the amount of payments to be made to providers for covered services furnished to Medicare beneficiaries."  42 C.F.R. § 421.100(a)(1); *see* 42 U.S.C. § 1395h(a).  The intermediary reviews the annual report and performs audits if necessary,

---

Judge granted the motion on October 18, 2013, extending the reply deadline to October 31, 2013.  *Order* (ECF No. 20).

determines the total amount of Medicare reimbursement due to providers, and issues a Notice of Program Reimbursement which sets forth the amount of allowable Medicare payments. *See* 42 U.S.C. § 1395kk-1; 42 C.F.R. § 405.1803(a). A provider dissatisfied with the intermediary's determination of total reimbursement may file an appeal with the Provider Reimbursement Review Board (Board). 42 U.S.C. § 1395*oo*(a). If the amount in controversy exceeds $10,000, the provider is entitled to a hearing before the Board. *Id.* § 1395*oo*(a)(2). The Board's decision must be based on "substantial evidence when the record is viewed as a whole" and the Board has the "power to affirm, modify, or reverse a final determination of the fiscal intermediary." *Id.* § 1395*oo*(d). The Board's decision is final unless the Secretary reverses, affirms, or modifies the decision within 60 days. *Id.* § 1395*oo*(f)(1). The statute grants the provider the right to judicial review of the Secretary's decision. *Id.*

The Medicaid statute, 42 U.S.C. §§ 1396—1396w-5, establishes a cooperative federal-state program that finances medical care for certain categories of low-income persons. Under Medicaid, the federal government provides financial support that assists each state in operating a state-administered program. 42 U.S.C. §§ 1396b. Under these programs, the state pays for health care services according to the particular specifications of its plan (although CMS must approve a state's plan before it qualifies for federal assistance) regarding matters such as financial eligibility, types of services covered, and payment amounts. *See id.* §§ 1396b, 1396d. MaineCare is the Medicaid plan run by the state of Maine.

Where a person qualifies for both Medicare and Medicaid (MaineCare) (principally elderly low-income individuals), federal law sets out who bears financial responsibility for the medical costs of these so-called dual eligible patients. Medicare is the primary payer and MaineCare is the secondary payer for "dual eligibles," less any applicable Medicare coinsurance or deductibles. *Pl.'s Mot.* at 4 (citing *Ans.* ¶ 11-12). Once Medicare has made its payment to the provider, the claim for any Medicare coinsurance and deductible amounts "crosses over" and becomes the responsibility of MaineCare. *Id.* (citing *Ans.* ¶ 13).

The Medicare statute prohibits cost-shifting, so that costs associated with covered Medicare services may not be borne by non-Medicare patients or third-party payers, such as private insurance companies and Medicaid. 42 U.S.C. § 1395x(v)(1)(A)(i). To effect this statutory policy, the Secretary promulgated a regulation, 42 C.F.R. § 413.89(e),[2] allowing providers to add the unpaid deductible and coinsurance amounts of its Medicare patients—so-called "bad debts"—to its allowable Medicare costs, but only when certain conditions are met:

(1)    The debt must be related to covered services and derived from deductible and coinsurance amounts.
(2)    The provider must be able to establish that reasonable collection efforts were made.
(3)    The debt was actually uncollectible when claimed as worthless.
(4)    Sound business judgment established that there was no likelihood of recovery at any time in the future.

*Id.*; *see Def.'s Opp'n* Attach 1 *Chapter 3: Bad Debts, Charity, and Courtesy Allowances* at 4 ("Criteria for Allowable Bad Debt") (ECF No. 14) (*PRM*).

---

[2]    This regulation was redesignated without substantive change in 2004. Before the change, it was designated at 42 C.F.R. § 413.80 (2003).

CMS produces a Provider Reimbursement Manual (PRM), which provides additional guidance on the Secretary's interpretation and application of the regulations it has promulgated. *See Shalala v. Guernsey Mem. Hosp.*, 514 U.S. 87, 99 (1995). Chapter 3 of the PRM addresses circumstances under which Medicare will reimburse "bad debts" under 42 C.F.R. § 413.89(e). *PRM* at 1-8. Section 310 of the PRM expands on "reasonable collection efforts," explaining that "a provider's effort to collect Medicare deductible and coinsurance amounts must be similar to the effort the provider puts forth to collect comparable amounts from non-Medicare patients." *Id.* at 4-5. Section 310 also instructs that these efforts "must involve the issuance of a bill . . . to the party responsible for the patient's personal financial obligations." *Id.* at 4. However, a dual eligible patient can be deemed "indigent," in which case a presumption of uncollectibility may apply where the provider would not have to comply with Section 310 procedures. *Id.* at 5-6 (§ 312). If a Medicare patient has not been deemed indigent due to his or her Medicaid eligibility, Section 312 states that a determination of indigency may also be made using the "customary methods for determining the indigence of patients." *Id.* at 6. This alternative method includes the following instruction: "The provider must determine that no source other than the patient would be legally responsible for the patient's medical bill." *Id.* at 7.

Section 312 does not directly discuss the financial obligation of state Medicaid programs for the deductible and coinsurance payments of indigent patients. It does, however, instruct that once indigency has been determined, "the

debt may be deemed uncollectible without applying the § 310 procedures. (See § 322 for bad debts under State Welfare Programs.)" *Id.* Section 322 expressly addresses the financial obligation of a state Medicaid program in such situations. *Id.* at 7-8 (§ 322). "Where the state is obligated either by statute or under the terms of its plan to pay all, or any part of, the Medicare deductible or coinsurance amounts, those amounts are not allowable as bad debts under Medicare." *Id.* By contrast, "[a]ny portion of such deductible or coinsurance amounts that the State is not obligated to pay can be included as a bad debt under Medicare, provided that the requirements of § 312, or, if applicable, § 310 are met."[3] *Id.* at 8.

On August 10, 2004, CMS issued Joint Signature Memorandum 370 (JSM-370), which addresses its policy regarding Medicare reimbursement of dual eligibles' bad debts. JSM-370 notes that language had been added to the cost report questionnaire section of the PRM in 1995 that "allowed providers to show other documentation in lieu of billing the states," but in 2003, the Ninth Circuit found the language to be unenforceable. *Admin. R.* at 597 (citing *Cmty. Hosp. of Monterey Peninsula v. Thompson*, 323 F.3d 782, 798 (9th Cir. 2003) (holding the language added in 1995 was "inconsistent with the Secretary's must-bill policy") (*Monterey*)). JSM-370 states that the Secretary had, in response, "changed the language . . . to revert back to pre-1995 language, which requires providers to bill the individual states for dual-eligibles' co-pays and deductibles before claiming Medicare bad

---

[3]     Analogous to this provision, Section 322 also addresses the situation where a state Medicaid program has an applicable payment ceiling, in which case the "amount that the State does not pay [because of the 'ceiling'] that remains unpaid by the patient[] can be included as a bad debt under Medicare, provided that the requirements of § 312 are met." *PRM* at 9.

debt." *Id.* at 598. JSM-370 thus serves to rearticulate the Secretary's "must-bill" policy:

> In order to fulfill the requirement that a provider make a "reasonable" collection effort with respect to the deductibles and co-insurance amounts owed by dual-eligible patients, our bad debt policy requires the provider to bill the patient or entity legally responsible for the patient's bill before the provider can be reimbursed for uncollectible amounts.
> …
> [I]n those instances where the state owes none or only a portion of the dual-eligible patient's deductible or co-pay, the unpaid liability for the bad debt is not reimbursable to the provider by Medicare until the provider bills the State, and the State refuses payment (with a State Remittance advice).

*Id.* at 597.

## C.    Factual Background

MMC is a non-profit, duly licensed acute care hospital with a principal place of business in Portland, Maine. *Compl.* ¶ 1. It provides medical services to both Medicare and MaineCare beneficiaries, including dual eligible patients. *Compl.* ¶ 2. At the time relevant to this dispute, MaineCare and Medicare had a Trading Partner Agreement, which addressed the coordination of benefits for crossover patients. *Admin. R.* at 174.[4] MaineCare provided certain patient eligibility information to Medicare, which allowed Medicare to identify and report crossover patients to MaineCare. *Id.* During fiscal years 2002 and 2003, MMC submitted its crossover claims—claiming "bad debts" for uncollected coinsurance and deductible amounts related to the care of dual eligibles—to MaineCare on a weekly basis,

---

[4]    The parties filed the administrative record with the Court. *Admin. R.* (ECF No. 7). The administrative record reveals that during the administrative proceeding, the parties stipulated to this and other facts. *Id.* at 172-75. The Court has accepted these stipulations.

pursuant to the Trading Partner Agreement between Medicare and MaineCare. *Id.* at 13, 174.

Prior to July 1, 1999, MaineCare paid providers some or all of the coinsurance and deductible amounts associated with dual eligible patients. *Admin. R.* at 173. For dates of service on or after July 1, 1999, however, the MaineCare Benefits Manual states that MaineCare had eliminated all payments for crossover claims. *Id.* at 173, 1562. According to MMC, MaineCare would "[g]enerally . . . process the crossover claims [submitted by MMC] and issue remittance advices to the Plaintiff showing a zero payment." *Pl.'s Mot.* at 5 (citing *Admin. R.* at 132, 2344-45). But, in November of 2001 "an anomaly of unknown origin occurred wherein a large number of Medicare crossover claims from [MMC] which were apparently sent to MaineCare by the [intermediary] were never processed by MaineCare." *Admin. R.* at 174. Due to this problem with the state's claims-processing system, MaineCare remittance advices (RAs) for these crossover claims were never issued and MaineCare still cannot identify and process such claims. *Id.* at 173-74. After MaineCare failed to produce the claims, MMC worked with Medicaid eligibility data held by the Muskie Institute[5] to provide alternative documentation in support of the crossover bad debt claims. *Admin. R.* at 53, 135-37. On July 25, 2005, MMC was notified that the intermediary would not accept the submission of crossover bad debts claims not supported by a MaineCare

---

[5]   The Muskie Institute is a quasi-state agency that assists MaineCare with certain functions and has MaineCare eligibility data. *Admin. R.* at 128.

remittance advice—claims totaling $1,114,091 for fiscal year 2002 and $1,744,992 for fiscal year 2003. *Admin. R.* at 172-73.

The parties vigorously dispute whether MaineCare would have or could have lawfully denied all reimbursement for crossover claims during the fiscal years in question. *See, e.g.*, *Pl.'s Reply* at 5 ("[T]here is no uncertainty here. MaineCare's duly enacted regulation was clear that no payment was allowed, and . . . this was exactly how MaineCare implemented the regulation"); *Def.'s Reply* at 2-3 ("Plaintiff's failure to address the issue of the State's payment responsibility thus reveals a fundamental flaw in its position: the hospital contends that the Federal Medicare program should be required to pay for the total amount of its crossover bad debt, even though it is virtually certain that the State was responsible under Federal law for a significant portion of this debt"). *See also* discussion *infra* note 9.

### D. Administrative Proceedings

While MMC maintained that remittance advices were not required "under the unique circumstances involved in these cases," the intermediary denied the claims on the basis that such RAs are required by CMS policy before the unpaid amounts may be claimed as a bad debt. *Admin. R.* at 174.

MMC appealed to the Board, which reversed the intermediary's determination in a decision dated November 29, 2012. *Id.* at 57-58. The Board first parsed the language of 42 C.F.R. § 413.89(e) and Chapter 3 of the PRM and found "that neither the regulation nor the manual sections contained a requirement to bill the state Medicaid agency." *Id.* at 55. It reasoned that to read the relevant

provisions of the PRM (Sections 310, 311, and 322) "as an absolute bar, regardless of the collection effort, would conflict with the statute and regulation allowing payments for Medicare bad debts," and noted that "the concept of reimbursement for bad debts . . . is premised on the inability to collect, despite reasonable collection efforts." *Id.* at 56. It next found that JSM-370, which sets forth the must-bill policy, "is entitled to little weight . . . because a JSM is not to be used to set policy, nor convey new instructions or clarification of existing requirements to intermediaries." *Id.* Finally, the Board concluded that "the Provider had actively pursued obtaining the remittance advices, but due to circumstances beyond [its] control . . . was unable to obtain the advices," that "the bad debts were actually uncollectible when [MMC] claimed them as worthless[,] and that sound business judgment established that there was no likelihood of recovery at any time in the future." *Id.* at 57. On this basis, the Board held that MMC "met the requirements for a reasonable collection effort related to the dual eligible beneficiaries as required by 42 C.F.R. §413[.]89 and the manual instructions," and therefore "[t]he Intermediary improperly disallowed the bad debts arising from coinsurance and deductibles for dual eligible Medicare and Medicaid beneficiaries." *Id.*

On January 28, 2013, the Secretary reversed the Board's decision.[6] *Admin. R.* at 2-21. After reviewing the applicable law and Medicare policy, the Secretary concluded that "the failure to produce the Medicaid remittance advices represents a

---

[6]     Review of the Board's decision was conducted by the CMS Administrator; the Administrator's decision constituted the final administrative decision of the Secretary. *Admin. R.* at 2, 21.

failure on the part of the Provider to meet the necessary criteria for Medicare payment . . . related to these claims and the Intermediary was correct to deny the crossover bad debt claims." *Id.* at 14, 21. The Secretary reasoned that upon "[r]eading the sections [of the PRM] together," the must-bill requirement was implied and had "been consistently articulated in the final decisions of the Secretary addressing this issue, since well before the cost year in this case." *Id.* at 14-15. The Secretary asserted that remittance advices were necessary both to confirm the validity of bad debt claims and safeguard against duplicative recoveries, and because it serves as an "essential and required record keeping criteria for Medicare reimbursement." *Id.* at 17. Finally, the Secretary noted that MMC did not meet the criteria for the "hold harmless" provision of JSM-370, which allows a provider to obtain reimbursement based on an alternative billing method if the provider had previously relied on that method—before publication of JSM-370—and the method had been accepted by the intermediary. *Id.* at 19.

## II.  THE PARTIES' POSITIONS

### A.  MMC's Motion

#### 1.  Legal Standard

MMC maintains that the "reasonable collection efforts" requirement, as set out in 42 C.F.R. § 413.89(e) and Chapter 3 of the PRM, need not include production of a remittance advice. *Pl.'s Mot.* at 13-15. MMC notes that the PRM "describes several situations in which a Provider may be presumed to have taken such efforts, or excused there[]from." *Id.* at 13 (noting Section 312's instruction that the "debt

may be deemed uncollectible without applying the § 310 procedures" after indigence is determined). MMC contends that a second situation is found in Section 322, "Medicare Bad Debts Under State Welfare Programs," which states in part:

> Any portion of such deductible or coinsurance amounts that the State is not obligated to pay can be included as a bad debt under Medicare, provided the requirements of § 312 or, if applicable, § 310 are met.

*Id.* (quoting *PRM* at 7-8). Based on these provisions, MMC argues "the plain language of the PRM does not specifically require a Medicaid remittance advice for Crossover Bad Debts. *Id.* at 14.

MMC next notes in November 1995, CMS added language to the PRM that "allowed providers to show other documentation in lieu of billing the states." *Admin. R.* at 2328; *see Pl.'s Mot.* at 14. Under then-existing Section 1102.3L, there was "a process for claiming Crossover Bad Debts in lieu of billing the Medicaid program," which required:

1. Medicaid eligibility at the time services were rendered (via valid Medicaid eligibility number), and

2. Non-payment that would have occurred if the crossover claim had actually been filed with Medicaid.

*Pl.'s Mot.* at 14 (quoting *Admin. R.* at 2365). This, according to MMC, demonstrates that "the Secretary has issued guidance, applicable to FY 2002 and FY 2003, that a Medicaid remittance advice was <u>not</u> required as documentation for a Medicare crossover bad debt." *Id.* at 14 (emphasis in original). Critically, even though CMS noted in JSM-370 that the language in Section 1102.3L had been changed and was in any event unenforceable in light of the must-bill policy, *id.* at 14 n.5, 27, MMC argues that the following "hold harmless provision" in the JSM applies to its claim:

This memorandum serves as a directive to hold harmless providers that can demonstrate that they followed the instructions previously laid out in 1102.3L, for open cost reporting periods beginning prior to January 1, 2004.

*Id.* at 27 *(*quoting *Admin. R.* at 2329).

## 2. Argument

MMC asserts that the Secretary's decision "exalts form over substance," *id.* at 1, 19, 29, and argues that "it satisfied each of the four criteria set for[th] in the plain language of 42 C.F.R. § 413.8[9](e)." *Id.* at 15. Focusing heavily on the second criterion—"reasonable collection efforts"—the Provider insists that its "collections efforts went beyond reasonable." *Id.* at 16. MMC asserts that it made reasonable attempts to obtain the remittance advices from MaineCare, and when MaineCare failed to provide the remittance advices as required by the Trading Partner Agreement, MMC worked with the Muskie Institute to provide alternative documentation verifying that each patient for whom reimbursement was sought was in fact a dual eligible.[7] *Id.* In furtherance of its argument that the efforts

---

[7]  Ronald Mercier, accounting consultant for MMC, testified before the Board:

[T]he next step that we undertook was to verify Medicaid eligibility because we have to be certain that Medicaid eligibility is in place for processing and payment on a Medicare cost report[.] So we utilize the hospital's records, internal records, which came from their patient accounting system where every discharge, every patient that comes into the hospital is in their system and is a Medicaid patient with a Medicare primary that's going to show up on their patient accounting system. And so we access many years of those. But most importantly, we work with the Muskie Institute and we supply them with the entire Medicare electronic remittance to have them verify Medicaid eligibility, which is exactly the same process that would be undertaken had the tapes crossed over like they should have. So this log would be no different than what would have been produced on a paper remit by Medicaid. All the Medicare demographics would deduct to one coinsurance, they'd service the patient ID, the patient name, and most importantly, Medicaid eligibility has been proven through the Muskie Institute on these logs.

taken were reasonable, MMC argues that "[i]t was not required to sue the State of Maine to receive the remittance advices." *Id.* at 17.

MMC also argues that legal action would have been futile in this situation because MaineCare had eliminated "[p]ayments for crossover claims . . . for dates of services on or after July 1, 1999." *Id.* at 14-15 (quoting *Admin. R.* at 2332 (Maine Medicare Assistance Manual, Chapter III, § 45)). The practical impact, according to MMC, was that "MaineCare denied payment for <u>all</u> acute care hospital crossover claims beginning July 1, 1999," so that any hypothetical remittance advice would have offered zero payment. *Id.* at 15 (emphasis in original). Further, since MaineCare's malfunctioning system "was never able to process crossover claims," MaineCare could not have complied with a court order compelling the processing of such claims in any case. *Id.* at 17. MMC also argues that neither a state nor federal court has the authority to order MaineCare to process the remittance advices. *Id.* at 17-18 (citing *Doe v. Gonzaga*, 536 U.S. 273 (2002); *H.D. Goodall Hosp. v. Dep't of Health & Human Servs.*, 2008 ME 105, ¶¶ 10-12, 951 A.2d 828, 830-31). In short, MMC argues that "[t]he PRM only requires 'reasonable' collection efforts. It does not require a provider to undertake litigation, especially when – as here – such action would be futile." *Id.* at 18.

Next, MMC insists it has met the third and fourth criteria. Reasserting that if the MaineCare claims processing system had actually worked during the time in question, "each and every remittance advice would have set forth a <u>zero</u> payment

---

*Admin. R.* at 135-36.

amount," it argues that "there is no dispute that the Crossover Bad Debts were actually uncollectible." *Id.* (emphasis in original). MMC also points out that it could not collect the coinsurance and deductible amounts from the patients, because federal Medicaid law prohibits providers from attempting to collect such amounts from Medicaid recipients. *Id.* at 18-19 (citing 42 U.S.C. § 1396a(a)(25)(C)). As further proof that the claims were "actually uncollectible when claimed as worthless," MMC notes that the intermediary "had accepted the zero pay crossover claims remittance advices from the Plaintiff in past cost reporting periods, and from other Maine hospitals during this time period." *Id.* MMC's characterization of the final criterion follows a similar line of reasoning: since MaineCare had "clearly eliminated" crossover claim payments during the period at issue, "the Provider exercised sound business judgment when it determined that there was no likelihood of recovery at any time in the future." *Id.* at 19.

MMC next addresses the standard of review, characterizing the Secretary's interpretation of 42 C.F.R. § 413.89(e) and the PRM as a "one-size-fits all 'policy' [that] cannot withstand this court's proper review." *Id.* at 20. Instead, MMC maintains that neither the applicable regulation (42 C.F.R. § 413.89(e)) nor the PRM "mandate[s] specific actions or items, such as a remittance advice, but rather outlines general concepts like 'reasonable collection efforts' and 'sound business judgment.'" *Id.* at 21. MMC argues that the Secretary's interpretation poses "additional, unstated rules," and is therefore "arbitrary and capricious, and not in accordance with the applicable law." *Id.*

Next, MMC claims that the Secretary's "must-bill" policy does not deserve deference because of her inconsistent interpretation of the regulation. *Id.* Citing *St. Luke's Hosp. v. Secretary of Health & Human Services*, 810 F.2d 325, 331 (1st Cir. 1987), for the proposition that "an agency's inconsistency detracts considerably from the force of the Secretary's argument for deference," MMC insists that the Secretary's interpretation appears neither in a regulation, nor in the PRM, and that the policy "has not been consistently applied by CMS, as evidenced by the CMS' own cost report filing instructions, which specifically permitted alternatives to a Medicaid remittance advice when documenting crossover bad debts." *Pl.'s Mot.* at 21 (citing since-repealed § 1102.3L).

MMC also maintains that cases upholding the Secretary's must-bill policy presented different facts and are distinguishable from the instant case. *Id.* at 24-27. MMC explains that in *Monterey*, where the Ninth Circuit upheld the policy, "the hospitals did not present their crossover claims to the California Medicaid program even though there was a possibility of payment." *Id.* at 24 (citing *Monterey*, 323 F.3d 782). Similarly, a federal district court in the District of Columbia upheld the Secretary's policy, but MMC contends that the Medicaid program there "clearly could" process the provider's crossover claims, there was a possibility of repayment, and the Secretary had even "stepped in" to enforce the state Medicaid plan and reach an agreement. *Id.* at 25 (citing *Grossmont Hosp. Corp. v. Sebelius*, 903 F. Supp. 2d 39 (D.D.C. 2012)). By contrast, MMC submits that it presented its crossover claims to the Medicaid program, there was no possibility of payment for

the claims, and the Secretary did not exercise her enforcement authority to require MaineCare to issue any remittance advices. *Id.* at 24-25.

MMC characterizes a separate District of Columbia district court decision, *Cove Associates Joint Venture v. Sebelius*, 848 F. Supp. 2d 13 (D.D.C. 2012), as "more closely align[ed] with the present matter." *Pl.'s Mot.* at 25. There, the district court commented in dictum that if a "non-participating provider"[8] could "establish that they have submitted the correct forms and made the right applications, it may in fact, in those circumstances, be arbitrary and capricious for the Secretary to not accept an alternative form of documentation or to require that the states comply with her regulations." *Cove Associates*, 848 F. Supp. 2d at 28. MMC argues that its position is even more favorable because, "unlike the *Cove Associates* providers, the Plaintiff has done all it could do" in attempting to receive remittance advices, and also because "although the *Cove Associates* providers had a potential for payment from a Medicaid program, the Plaintiff here did not." *Pl.'s Mot.* at 26.

Finally, notwithstanding its other arguments, MMC asserts that the "hold harmless" provision within JSM 370 "plainly applies" to its claims. *Id.* at 27. It states that the language in the JSM instructing intermediaries to "hold harmless providers that can demonstrate that they followed the instructions previously laid out in 1102.3L," *id.* (quoting *Admin. R.* at 2329), must apply to this case because the

---

[8]    As the district court defined it, the "non-participating provider" did not participate in the state's Medicaid program but did provide services to dual-eligible patients. *Cove Associates*, 848 F. Sup. 2d at 28.

"cost reporting periods began prior to January 1, 2004, and were open as of the date of the JSM (August 10, 2004)." *Id.* MMC insists that it "clearly relied upon alternative documentation for these open cost reporting periods . . . [that] undoubtedly satisfied the requirements of 1102.3L." *Id.* at 27-28.

### B. The Secretary's Cross-Motion and Opposition

#### 1. Legal Standard

The Secretary notes her authority to promulgate "'reasonable and proper rules' establishing 'the nature and extent of the proofs and evidence and the method of taking and furnishing the same in order to establish [the payments due under the program].'" *Def.'s Opp'n* at 4-5 (quoting 42 U.S.C. § 1395ii (incorporating 42 U.S.C. § 405(a))). The Secretary points out that the Medicare statute further provides that "no [Medicare] payments shall be made to any provider unless it has furnished such information as the Secretary may request in order to determine the amount due such provider." *Id.* at 5 (quoting 42 U.S.C. § 1395g(a)). In accordance with this authority, the Secretary promulgated a regulation, 42 C.F.R. §§ 413.20(a), 413.24(a), (c), requiring providers to maintain financial records that are sufficiently detailed to determine which costs are payable under Medicare. *Def.'s Opp'n* at 5.

With respect to Chapter 3 of the PRM, the Secretary maintains that the manual specifies a provider's efforts may be considered reasonable only if collection efforts include "*the issuance of a bill* on or shortly after discharge . . . to the party responsible for the patient's personal financial obligations." *Id.* at 6-7 (alteration in original) (quoting *PRM* at 4 (§ 310)). The Secretary asserts that although Section

312 waives the "reasonable collection efforts" requirement of Section 310 when the Medicare beneficiary is a dual eligible, the provider must still "determine that no source other than the patient would be legally responsible for the patient's medical bills" in such situations. *Id.* at 7 (quoting *PRM* at 6 (§ 312)).

The Secretary then states that the must-bill policy was established in 1983 in order to put into effect the relevant Medicare regulations and manual provisions. *Id.* at 8. Congress later imposed a moratorium on bad debt reimbursement policies, which "prohibited the Secretary from changing 'the policy in existence as of August 1, 1987.'" *Id.* (citing *Omnibus Budget Reconciliation Act of 1987*, Pub. L. No. 100-203, § 4008(c), 101 Stat. 1330-55).

The Secretary next references the November 1995 amendment to Section 1102.3 of the PRM. *Id.* at 8-9. Admitting that this section allowed for alternative forms of documentation, the Secretary notes that on March 18, 2003, the Ninth Circuit found Section 1102.3L unenforceable to the extent that it authorized "reimbursement on the basis of a noncontemporaneous, 'surrogate data system.'" *Id.* at 9 (quoting *Monterey*, 323 F.3d at 799). In response to *Monterey*, the Secretary rewrote the 1995 amendment and "reiterated her must-bill policy in JSM-370." *Id.* at 9-10. Regarding the "hold harmless" provision of that memorandum, the Secretary notes that relief under this provision "was available only for 'cost reports that were open as of the date of issuance of this memorandum,' and only to providers 'who relied on the previous language of section 1102.3L in providing documentation.'" *Id.* at 10-11 (quoting *Admin. R.* at 598).

Finally, the Secretary notes that her interpretation of her own regulation is entitled to "particular deference," and should only be overturned if "plainly erroneous or inconsistent with" the regulations. *Id.* at 16 (quoting *South Shore Hosp., Inc. v. Thompson*, 308 F.3d 91, 97 (1st Cir. 2002) (internal citation omitted)).

## 2.    Argument

The Secretary insists that the must-bill policy is based on a reasonable interpretation of her Medicare regulation requiring a provider to make "reasonable collection efforts" and establish that a crossover bad debt was "actually uncollectible when claimed as worthless." *Id.* at 17 (quoting 42 C.F.R. § 413.89(e)(2), (3)). The Secretary also contends that the policy promotes Medicare recordkeeping regulations by requiring contemporaneous documentation of the provider's efforts to recover the debt from MaineCare. *Id.* at 19.

The Secretary further argues that her policy is reasonable because it "rests on the reasonable proposition that the only way of knowing for certain whether a State will pay a portion of a particular claim is to bill the state and obtain an RA." *Id.* at 27. The Secretary observes that the extent to which a state is obligated to pay for crossover claims depends on the provisions of each individual state plan (of which there are fifty-six), including the varied rates for services under each plan and a comparison of those rates to the amounts paid by Medicare for such services. *Id.* at 20. She points out that under 42 U.S.C. § 1396a(n)(2), a State may avoid paying deductibles and coinsurance for crossover claims only to a limited extent, *id.* at 22-23, and the providers should not foist upon the Secretary the "nightmarish

task of determining whether a given State Medicaid program would have made any payment for a crossover claim during a particular time period." *Id.* at 27. The Secretary argues that these considerations are directly applicable to this case: "[T]he State could not have lawfully implemented a complete ban on the payment of a crossover claim." *Id.* at 22. *See also id.* at 26 ("There is no evidence in the record as to when the State repealed its ban on the payment of crossover claims . . . . [I]t should not be presumed that MaineCare would continue to enforce a facially-invalid restriction on the payment of crossover claims").

Further, the Secretary explains that the policy allows for verification that each patient was actually eligible for Medicaid—a status which may change over a very short period—at the time services were rendered. *Id.* at 28. Billing the state and obtaining remittance advices also "allow[] the provider to comply with Medicare record-keeping requirements," which demand contemporaneous documentation. *Id.* at 28-29. The Secretary maintains MMC's "documentation did not establish the amounts that MaineCare was obligated to pay" and thus that MMC's alternative methodology failed to meet the alternative documentation requirements of former section 1102.3L. *Id.* at 31. Apart from that failure, the Secretary asserts that the former manual provision was unenforceable in any case, as it was contrary to the moratorium on changes to reimbursement policy Congress imposed in 1987 and therefore the Secretary lacked the authority to make an exception to the must-bill requirement. *Id.* In addition, she argues that the documentation MMC provided that did comply with former section 1102.3L was inconsistent with yet another

regulation, which requires Medicare cost determinations to be based upon "data available from the institution's basis accounts, as usually maintained." *Id.* at 32. As "a PRM provision that is inconsistent with a regulation is invalid," *id.* (citing *Monterey*, 323 F.3d at 799), the Secretary contends that section 1102.3L was unenforceable as applied to this case. *Id.*

The Secretary contests MMC's assertion that it "'did all that it could reasonably do' to obtain the necessary RAs." *Id.* at 32 (quoting *Pl.'s Mot.* at 3). The Secretary maintains that "[t]he record in this case confirms that Maine providers have the ability to manually bill MaineCare, yet plaintiffs made no attempt to do so." *Id.* at 33 (citing *Admin. R.* at 138, 146). Further, the Secretary contends that the record "strongly suggests that plaintiff's inability to obtain the RAs is attributable to its own failure to diligently pursue its claims," *id.*, noting that MaineCare ceased issuing RAs on crossover claims in 2001 but that MMC "did not request the State to issue the missing RAs until . . . March 22, 2006." *Id.* at 33-34 (citing *Admin. R.* at 850, 1608-09). She concludes that "[n]ot surprisingly, the State responded to this untimely request by professing that it did not have the ability to process the claims '[a]t this point in time." *Id.* (citing *Admin. R.* at 1606).

Finally, the Secretary insists that her administrative decision reasonably determined that the hold-harmless provision of JSM-370 does not apply to this case. *Id.* at 34-37. The Secretary contends the intermediary never allowed for MMC or any other Maine providers to support crossover claims with alternative documentation. *Id.* at 35. Therefore, she argues that MMC meets neither the

requirement that the intermediary "must have followed" the previous instruction nor the requirement of reliance on the instruction. *Id.* at 35-36. Accordingly, the Secretary concludes that this Court should reject MMC's request for hold-harmless relief. *Id.* at 36.

### C.    MMC's Reply

In reply, MMC reiterates its contention that the "Secretary continues to exalt form over substance." *Pl.'s Reply* at 1. It suggests that "[t]he Secretary would have the Court review this case in a vacuum," and that her accusations that it did not pursue the RAs vigorously enough are unsupported in the record; instead, "whatever attempts the Plaintiff may have made, it was simply not possible to obtain the RAs." *Id.* at 3. MMC also rejects the Secretary's claim that the must-bill policy is supported by Medicare record-keeping regulations, noting that it did in fact submit the claims at issue to MaineCare and insisting that [a]ny sins by the MaineCare program should not be visited upon the Plaintiff." *Id.* at 3-4.

MMC next takes issue with the Secretary "speculat[ing] that maybe the State should have paid *something* for *some* of the crossover claims." *Id.* at 5 (emphasis in original). It rejects any inference that a potential MaineCare payment obligation creates uncertainty that supports the reasonableness of the Secretary's policy, instead putting forth that "there is no uncertainty" in this situation because a Maine regulation "was clear that no payment was allowed." *Id.* at 4-5. Moreover, MMC asserts it is "disingenuous to now suggest that the Court should not believe that all of Plaintiff's RAs would have identified a zero payment amount," because

the Secretary had accepted the "no pay" RAs before, during, and after the years in question. *Id.* at 5. Furthermore, MMC insists that even if MaineCare was wrong in refusing to make crossover payments or issue RAs, "providers do not have private enforcement rights with respect to challenging reimbursement rates," *id.* at 6 (citing *Long Term Care Pharmacy Alliance v. Ferguson*, 362 F.3d 50, 59 (1st Cir. 2004)); only the Secretary maintains enforcement authority over state Medicaid programs. *Id.* at 5-6. For these reasons, MMC argues the Secretary should not be allowed to rely on the argument that remittance advices could have been produced. *Id.* at 6.

MMC also rejects the Secretary's accusation that it waited too long to ask MaineCare for the RAs or that filing manual claims would have allowed MaineCare to produce them. *Id.* at 6-9. MMC contends evidence in the record "clearly demonstrate[s] that the MaineCare program had previously advised [an accounting consultant for MMC] that the only possible solution was to work with the Muskie Institute, which the Plaintiff did before submitting its alternative documentation to the [intermediary] in 2005." *Id.* at 7 (citing *Admin. R.* at 2499-2502). MMC also claims that its accounting consultant's testimony before the Board demonstrates that the manual claims process was not a viable option in this case, because it "was designed for isolated situations" as opposed to the "tens of thousands of manual (paper) claims . . . that would be associated with nearly two years of claims at Maine's largest hospital." *Id.* at 8 (citing *Admin. R.* at 138).

Finally, MMC claims that the Secretary has improperly relied on the 1987 moratorium on bad debts, maintaining that it was "enacted by Congress to shield

providers from retroactively applied changes to the Secretary's . . . bad debt audit practices. Here, however, she hopes to use this shield as a sword to strike down the Plaintiff's reasonable interpretation argument." *Id.* at 9.

### D.  The Secretary's Reply

The Secretary contends that MMC's position is fundamentally flawed, because MMC argues that "Medicare . . . should be required to pay for the total amount of its crossover bad debt, even though it is virtually certain that the State was responsible under federal law for a significant portion of this amount." *Def.'s Reply* at 2-3. The Secretary dismisses what she characterizes as MMC's "several attempts to justify its failure to look to MaineCare for the State's share of its crossover bad debt," referring to MMC's suggestion that it had no interest or ability to pursue a claim against MaineCare as "perplexing – after all, any payments made by the State on plaintiff's crossover claims would have been made to plaintiff." *Id.* at 3. The Secretary rejects MMC's argument that no legal recourse was available to it, arguing "there is post-*Gonzaga* precedent in this circuit that Medicaid providers may bring suit under section 1983 to compel States to comply with mandatory Medicaid payment obligations." *Id.* at 4 (citing *Rio Grande Community Health Ctr. v. Rullan*, 397 F.3d 56, 72 (1st Cir. 2005)). By contrast, she contends that her own enforcement ability against the state is limited to a "compliance action," which does not include the authority to order MaineCare to provide benefits and could result only in a general cutoff of federal funding. *Id.* at 3.

The Secretary also contends that "[r]ather than simply acquiescing in MaineCare's position that it could not process the claims electronically, plaintiff could have submitted its claims manually . . . . [T]here is nothing in the record that clearly supports [the] assertion [that MaineCare would have refused to process such claims]." *Id.* at 5-6. Finally, the Secretary suggests that MMC could have asked MaineCare to reconsider its claims after the state amended its policy manual to recognize MaineCare's obligation to pay cost-sharing amounts, or that MMC could have attempted to document the amount that MaineCare should have paid on its claims as part of the alternative documentation it provided. *Id.* at 6.

In sum, the Secretary argues "[i]t is understandable that plaintiff would prefer to have Medicare pay for all of its crossover bad debt . . . . However, plaintiff's desire to avoid a quarrel with the State cannot be reconciled with the Medicare regulations, which require a provider to make 'reasonable collection efforts' . . . and which preclude Medicare from reimbursing . . . a bad debt for which another payer, such as Medicaid, is responsible." *Id.* at 6-7.

## III. DISCUSSION

### A. Standard of Review

MMC seeks judicial review pursuant to the Medicare statute, 42 U.S.C. § 1395*oo*(f), which permits providers to seek judicial review of any final decision by the Secretary in a federal district court pursuant to the standard of review set forth in the Administrative Procedure Act (APA). 5 U.S.C. § 706; *Central Maine Med.*, 552 F. Supp. 2d at 52. Under that standard, an inquiring court "may only set aside agency actions, findings, and conclusions if they are 'arbitrary, capricious, an abuse

27

of discretion, or otherwise not in accordance with the law' or 'unsupported by substantial evidence.'" *Visiting Nurse Ass'n Gregoria Auffant, Inc. v. Thompson*, 447 F.3d 68, 72 (1st Cir. 2006) (quoting 5 U.S.C. § 706(2)); *South Shore*, 308 F.3d at 97. "This standard precludes a reviewing court from substituting its own judgment for that of the agency." *Rhode Island Hosp. v. Leavitt*, 548 F.3d 29, 33-34 (1st Cir. 2008).

An agency's interpretation of its own regulations are normally accorded particular deference, and "[c]ourts withhold such deference only when the agency's interpretation of its regulation is 'plainly erroneous or inconsistent with' its language." *Visiting Nurse Ass'n*, 447 F.3d at 72 (quoting *South Shore*, 308 F.3d at 97). Put differently, "[t]o receive this deference, the agency need not write a rule that serves the statute in the best or most logical manner; it need only write a rule that flows rationally from a permissible construction of the statute." *Rhode Island Hosp.*, 548 F.3d at 34 (internal quotation marks and citation omitted). Additionally, "[i]n situations in which the meaning of regulatory language is not free from doubt, the reviewing court should give effect to the agency's interpretation so long as it is reasonable, that is, so long as the interpretation sensibly conforms to the purpose and wording of the regulations." *Visiting Nurse Ass'n*, 447 F.3d at 72-73 (quoting *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 150-51 (1991)).

The First Circuit has instructed that "[w]hile it is true that rules found in manuals such as the PRM are entitled to less deference than interpretations arrived

at after a formal adjudication or notice-and-comment rulemaking, this does not mean the rules . . . are not entitled to any deference at all." *Id.* at 76. Instead, "[i]f an interpretative rule is neither inconsistent with promulgated regulations, nor outside of the coverage of the Act, it is valid. Furthermore . . . 'broad deference [to the administrative agency] is all the more warranted when, as here, the regulation concerns a complex and highly technical regulatory program.'" *Id.* (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)); *accord Rhode Island Hosp.*, 548 F.3d at 36 ("Deference is particularly appropriate in an area that is as complex as the field of Medicare reimbursement"). Such programs "necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns." *Id.* (quoting *Thomas Jefferson*, 512 U.S. at 512). As specifically regards the PRM, the *Visiting Nurse Ass'n* Court concluded that "[b]ecause the manner in which the [PRM] is implemented is so integral to its operation, it would be odd not to defer to the Secretary's method of applying those rules, as well as those rules themselves." *Id.* at 78. What is at issue in this case is the Secretary's interpretation—through the PRM and must-bill policy—of her own regulations, and this Court concludes that the appropriate standard of review for that interpretation is "substantial deference," as described by the First Circuit in *Visiting Nurse Ass'n* and *South Shore*.

Finally, the party "challenging the Secretary's reasoning" has the burden to show that the reasoning "fails to pass muster under the reasonableness

standard." *South Shore*, 308 F.3d at 101; *Central Maine Med.*, 552 F. Supp. 2d at 52-53.

**B.    Analysis**

The issue on this motion and cross-motion can be distilled into a short overriding question: was the Secretary's administrative decision—that the intermediary properly denied the bad-debt claims submitted by MMC based upon the must-bill policy—arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or unsupported by substantial evidence?  5 U.S.C. § 706(2). To resolve this question, the Court addresses the following sub-issues: (1) whether the Secretary has the authority to implement the must-bill policy as a general matter (without regard to the facts of this case); and if so, (2) whether that policy is inapplicable here due to the "hold-harmless" provision of JSM-370; and (3) whether the Secretary's authority encompasses the application of that policy to MMC's bad-debt reimbursement claims.

**1.    Does the Secretary Have the Authority to Implement the Must-Bill Policy?**

The Medicare statute authorizes the Secretary to "prescribe such regulations as may be necessary" to administer Medicare.  42 U.S.C. § 1395hh(a)(1).  Congress has also instructed that the Secretary "shall adopt reasonable and proper rules and regulations to regulate and provide for the nature and extent of the proofs and evidence and the method of taking and furnishing the same in order to establish the right to benefits" under Medicare, such as payments due to providers.  *Id.* § 1395ii (incorporating 42 U.S.C. § 405(a))).  The statute places an additional emphasis on

providing the Secretary with wide discretion in determining what documentation a provider must submit when requesting payment under the statute. *Id.* § 1395g(a) ("[N]o such payments shall be made to any provider unless it has furnished such information as the Secretary may request in order to determine the amounts due such provider").

In response to this congressional mandate, the Secretary promulgated regulations articulating general principles to guide the administration of Medicare. One guiding principle instructs that providers must "maintain sufficient financial records and statistical data for proper determination of costs payable under the program," 42 C.F.R. § 413.20(a), and further that "the requirement of adequacy of data implies that the data be accurate and in sufficient detail to accomplish the purposes for which it was intended." *Id.* § 413.24(c). These general operating principles are put into effect by more specific regulations, such as the Secretary's instruction on when a provider's "bad debts" may be "allowable." *Id.* § 413.89(e). To be allowable, or eligible for reimbursement, a bad debt must meet the following criteria:

(1)     The debt must be related to covered services and derived from deductible and coinsurance amounts.
(2)     The Provider must be able to establish that reasonable collection efforts were made.
(3)     The debt was actually uncollectible when claimed as worthless.
(4)     Sound business judgment established that there was no likelihood of recovery at any time in the future.

*Id.*

The First Circuit has viewed these regulations as within the Secretary's authority. *See Visiting Nurse Ass'n*, 447 F.3d at 72; *South Shore*, 308 F.3d at 97. The question to resolve here is whether the "must-bill policy" is what the First Circuit refers to as a "valid" interpretive rule—a permissible interpretation of the above-mentioned Medicare statutory and regulatory provisions. *See Visiting Nurse Ass'n*, 447 F.3d at 76 ("If an interpretive rule is neither inconsistent with promulgated regulations, nor outside of the coverage of the Act, it is valid"). The Secretary asserts that the most efficient and accurate way to determine whether a state Medicaid program bears any responsibility for a crossover claim is to require the provider to bill the state program and obtain a remittance advice, which documents the state's official position on the matter. *Admin. R.* at 16; *Def.'s Opp'n* at 18. This proposition is articulated in JSM-370: "[T]he unpaid liability for the bad debt is not reimbursable to the provider by Medicare until the provider bills the State, and the State refuses payment (with a State Remittance advice)." *Admin. R.* at 597.

The Court concludes that the must-bill policy "flows rationally from a permissible construction of the statute." *Rhode Island Hosp.*, 548 F.3d at 34. Here, the Secretary has contended—and the Court agrees—that the policy reflects reasonable concerns about the viability and efficacy of an alternative requirement. Significantly, there are 56 different Medicaid plans, *Def.'s Opp'n* at 21 n.3, and the extent to which a state bears financial responsibility for a particular crossover claim may turn on provisions unique to each plan as well as a comparison of each plan's

rates to the Medicare rates for comparable services. *Id.* at 20. The Secretary contends that such variables would make it a "nightmarish task" were CMS required to undergo individualized determinations of whether a given state program would have made a particular crossover payment during a particular fiscal year. *Id.* at 27. Relatedly, the Secretary also insists that the must-bill requirement reflects the regulatory requirement that cost data be accurate and sufficiently detailed, 42 C.F.R. § 413.24(c), because "the State maintains the most current and accurate information to determine if the beneficiary is dually eligible at the time of service." *Admin. R.* at 16.

As the record provides ample support for these assertions, the Court will not substitute its own judgment for that of the Secretary on these matters. *Rhode Island Hosp.*, 548 F.3d at 33-34. As noted by the First Circuit, broad deference to the administrative agency tasked with carrying out legislation is particularly important in an area as complex as Medicare, because the Secretary's decisions in administering the program "necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns." *Visiting Nurse Ass'n*, 447 F.3d at 76. The First Circuit's admonition is fitting here, as the Secretary enacted the must-bill policy to implement general Medicare principles, *e.g.*, 42 C.F.R. § 413.24(c), and to impose more specific operating requirements such as documenting that "reasonable collection efforts were made" and "[t]he debt was actually collectible when claimed as worthless." *Id.* § 413.89.

Chapter 3 of the PRM does not change the analysis. MMC argues that "the plain language of the PRM does not specifically require a Medicaid remittance advice for Crossover Bad Debts." *Pl.'s Mot.* at 14. Section 312 provides that a "debt may be deemed uncollectible without applying the 310 procedures" in certain situations, *PRM* at 6, and Section 322 provides that a bad debt "that the State is not obligated to pay can be included as a bad debt under Medicare, provided the requirements of § 312 . . . are met." *Id.* at 8. MMC's assertion that Chapter 3 contains no hard-and-fast requirement of a Medicaid remittance advice is justified by the express language of the provisions.

However, Chapter 3 is far from unambiguous. In her administrative decision, the Secretary concluded: "Reading the sections [310, 312, and 322] together . . . in situations where a State is liable for all or a portion of the deductible and coinsurance amounts, the State is the responsible party and is to be billed and a remittance advice issued in order to establish the amount of bad debts under Medicare." *Admin. R.* at 14. That interpretation is also reasonable, particularly given the *Visiting Nurse Ass'n* Court's observation that "[b]ecause the manner in which the [PRM] is implemented is so integral to its operation, it would be odd not to defer to the Secretary's method of applying those rules." 447 F.3d at 78. Although Section 312 may allow providers to forego the collection procedures of Section 310 with respect to dual eligible patients, it does not discuss the financial obligation of state Medicaid programs in such situations; it states instead: "See § 322 for bad debts under State [Medicaid] Programs." *See PRM* at 6. Section 322

declares that "[w]here the State is obligated . . . to pay all, or any part, of the Medicare deductible or coinsurance amounts, those amounts are not allowable as bad debts under Medicare." *Id.* at 7-8. Multiple courts have found it reasonable to deduce that "the requirement under [Section] 322 that the state not have [any obligation to pay for] the patient's debt would be illusory if the regulations did not impose a duty to demand payment from the state." *Cove Associates*, 848 F. Supp. 2d at 25 (citing *Monterey*, 323 F.3d at 794-95). This Court agrees that such an implication is reasonable, and thus concludes that Chapter 3 of the PRM may be reasonably read to impose a must-bill requirement. *See Monterey*, 323 F.3d at 796 ("[O]ur conclusion would be no different if we believed the Providers' reading were a permissible one. At most, these provisions are ambiguous, and we must defer to the Secretary's reasonable determination that billing is required"); *Cove Associates*, 848 F. Supp. 2d at 25.

Nor is the must-bill policy otherwise "inconsistent with promulgated regulations, [or] outside the coverage of the [Medicare] Act." *Visiting Nurse Ass'n*, 447 F.3d at 76. The record contains ample evidence to support the Secretary's contention that the must-bill policy is a reasonable implementation of her Medicare regulations—both general regulations such as the requirement for data to be "accurate and in sufficient detail," 42 U.S.C. § 413.24(c), as well as the specific regulation requiring "reasonable collection efforts" and a showing that the debt "was actually uncollectible." 42 C.F.R. § 413.89(e).

## 2. Does the "Hold Harmless" Provision of JSM-370 Apply?

If the hold harmless provision of JSM-370 applied to MMC's claims, the Court would have to determine how that conclusion impacted whether the Secretary's application of the must-bill policy to MMC's bad debt claims was arbitrary and capricious or contrary to law. However, the Court does not reach that issue, because the Secretary reasonably concluded in her administrative decision that the hold-harmless provision did not apply.

In her administrative judgment, the Secretary found that MMC

> failed to demonstrate that it relied on section 1102.3L and alternative documentation to support its crossover bad debt claims <u>and</u>, as a critical criteria, that the Intermediary accepted such documentation and made payment based upon such documentation for [previous] cost reporting periods.

*Admin. R.* at 19 (emphasis in original). JSM-370 provides, in part:

> This memorandum is to serve as a directive to hold harmless providers that can demonstrate that they followed the instructions previously laid out in 1102.3L, for open cost reporting periods beginning prior to January 1, 2004.
> …
>
> Intermediaries that required the provider to file a State Remittance Advice for cost reporting periods prior to January 1, 2004, may NOT reopen provider's costs reports to accept alternative documentation . . . . This "hold harmless policy" affects only those providers with cost reports that were open as of the date of issuance of this memorandum, relating to cost reporting periods before January 1, 2004, and who relied on the previous language of section 1102.3L in providing documentation.

*Id.* at 2329. MMC argues that "[t]he JSM does not prohibit . . . the application of this hold harmless provision where an Intermediary previously required the provider use Medicaid remittance advices." *Pl.'s Mot.* at 27. That argument, however, is an argument against judicial deference to an agency's interpretations of

its own regulations and opinions. The Court does not adjudicate whose interpretation is better, only whether the Secretary's conclusion was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law or unsupported by substantial evidence." *Visiting Nurse Ass'n*, 447 F.3d at 72.

By its own terms, the hold harmless provision only affects providers "who relied on the previous language of section 1102.3L in providing documentation," and based on this language the Court does not conclude that it was unreasonable for the Secretary to limit the hold-harmless provision's applicability to situations in which an intermediary had previously accepted alternative documentation in support of crossover bad debt claims. The Secretary's construction sensibly interprets the requirement that the provider must have "relied on the previous language." *Admin. R.* at 2329.

### 3. Was the Secretary's Application of the Must-Bill Policy to MMC's Bad Debt Claims Arbitrary and Capricious or Otherwise Not in Accordance With Law?

Having concluded that the must-bill policy is a proper exercise of the Secretary's authority and that the "hold harmless" provision of JSM-370 does not apply to this case, the remaining question is whether the Secretary's application of the must-bill policy to MMC's claims was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law or unsupported by substantial evidence." *Visiting Nurse Ass'n*, 447 F.3d at 72 (quoting 5 U.S.C. § 706(2)); *South Shore*, 308 F.3d at 97. MMC argues that "the Secretary's application of her so-called 'must-bill' policy is unsupported by the plain language of the

applicable regulation, and is arbitrary and capricious as applied to the undisputed facts." *Pl.'s Mot.* at 9. MMC suggests that because it "did all that it could reasonably do in response to this usual situation," *id.* at 3, "application of the Secretary's 'must-bill' policy leads to an absurd result, when, as here, the State failed to provide the RAs." *Pl.'s Reply* at 10. The Secretary counters that excusing or waiving MMC's failure to comply with the must-bill policy would be contrary to the Secretary's regulations and would adversely affect CMS's "ability to manage the complex interrelationships between [Medicare] and the various state-administered Medicaid programs." *Def.'s Opp'n* at 3-4.

The Court recognizes MMC's argument that the must-bill policy as applied to the facts of this case may appear inconsistent with the "reasonable collection efforts" bad debt criterion, 42 C.F.R. § 413.89(e)(2). MMC submitted the claims at issue to MaineCare, but MaineCare never produced a remittance advice for them. *Admin. R.* at 174. The MaineCare program advised MMC to work with the Muskie Institute, which had access to the same Medicaid eligibility information that MaineCare would have used in processing the remittance advices. *Id.* at 134. MMC accepted MaineCare's suggestion and worked with the Muskie Institute to document MaineCare eligibility for each patient on the crossover listings at issue in this case, based on the same information that Medicaid would have used. *Id.* at 134-35.

The Court's task, however, is not to determine whether MMC did all it could reasonably do to satisfy the particular requirement that "reasonable collection

efforts were made."[9]  *See* 42 C.F.R. § 413.89(e)(2).  Instead, the inquiry is whether

the Secretary's finding that the must-bill policy applied to MMC's claims failed to

meet the deferential standard of review the First Circuit articulated in *Visiting*

*Nurse Ass'n* and *South Shore*.  The Secretary does not assert that her interpretive

---

[9]     MMC's argument in support of its position that its alternative documentation was
reasonable presupposes certain considerations, including that MaineCare's counterfactual
remittance advices would have documented a zero payment obligation.  However, as the Court noted
earlier, the parties vigorously dispute whether MaineCare would have, or lawfully could have,
denied all reimbursement for MMC's 2002 and 2003 crossover claims.  The parties charge each other
with speculation: MMC insists the Secretary is speculating that MaineCare would have had to pay at
least some of these amounts, *Pl.'s Reply* at 5, whereas the Secretary insists that MMC is speculating
that MaineCare would not have paid any of these amounts.  *Def.'s Opp'n* at 22-27.
     Determining whether MaineCare would have accepted responsibility for some or all of these
payments for services rendered in 2002 and 2003 turns on not only a close parsing of the contested
factual record but also interpretation of dense language deep in the Medicare statute.  *See* 42 U.S.C.
1396a(n)(1)-(3).  In making its argument, MMC heavily relies upon the Maine Supreme Judicial
Court case of *H.D. Goodall Hospital*.  *Pl.'s Mot.* at 17 ("Finally, Maine['s] highest court has held that,
in the absence of a specific deadline contained in MaineCare regulations, the court is without
authority to order the agency to act" (citing *Goodall*, 2008 ME 105, ¶¶ 10-12, 951 A.2d 828, 830-31)).
MMC, however, reads too much into *Goodall*.  In *Goodall*, the Maine Law Court refused to read into
the Provider Agreement between the state of Maine and the provider or into Maine statutes and
regulations an obligation to make payment within a reasonable time.  *Id.*  However, the Maine
Supreme Judicial Court did not address the prospect of the state of Maine never processing the
claims at all.  Whether MMC could have successfully sued the state of Maine to force it to do its job
remains to be seen, because MMC never did so.
     Another assumption is that the transcript of MMC's accounting consultant's testimony before
the PRRB conclusively establishes that MaineCare would not have produced remittance advices if
MMC had manually billed the crossover claims.  *See, e.g., Pl.'s Reply* at 7-9.  The Secretary rejects
that this assumption is supported by the record, in part by correctly noting that Mr. Mercier only
testified that the state "advised hospitals not to bill manually" in 2005 or 2006, well after the fiscal
years in question.  *Def.'s Opp'n* at 33 n.12.  Mr. Mercier did not comment on the State's position in
2002-2003, and even with respect to the 2005-2006 period, he testified only that "there were isolated
hospitals that [billed manually].  And . . . I won't say they were reprimanded but they were told not
to do that." *Admin. R.* at 146.  He did not unambiguously say, for example, that MaineCare "still
would not have been able to produce the RAs." *Pl.'s Reply* at 9.
     To decide this case, the Court is not required to determine who is right on either of these
issues.   The applicable standard for review is not which party has proven the case by a
preponderance of the evidence.  Rather, it is whether MMC has demonstrated that the Secretary's
decision is arbitrary, capricious, an abuse of discretion, contrary to law, or unsupported by
substantial evidence.  For the reasons set out in the remainder of this section, applying this onerous
standard, the Secretary's larger argument carries the day: before MMC may demand payment under
Medicare, it must comply with particular federal requirements, including the must-bill policy.  The
Court accepts the Secretary's argument, not that MaineCare would have capitulated or that manual
submissions would have resulted in RAs being issued, but instead that MMC's failure to produce the
RAs amounted to a failure to comply with the Secretary's precondition for reimbursement and has
led to arguments in 2014 that should have been resolved by MMC's compliance in 2002 and 2003.

rule relates only to the bad debt criteria, *id.* § 413.89(e), and therefore the Court must consider other relevant regulations alongside the bad debt criteria in its review of the Secretary's must-bill policy, such as "the requirement . . . that the data be accurate and in sufficient detail to accomplish the purposes for which it was intended." *Id.* § 413.24(c). Furthermore, even when read in isolation, 42 C.F.R. § 413.89(e) may be read to infer additional requirements. It states that "bad debts must meet the following criteria" to be "allowable" for reimbursement. 42 C.F.R. 413.89(e). In other words, compliance with these criteria is a necessary precondition to reimbursement, but may not by itself be sufficient to mandate reimbursement. Thus, this language presupposes the existence of other matters applicable to the determination of whether a certain "debt" should receive Medicare funding.

In her review of the Provider Reimbursement Review Board decision, the Secretary concluded with following observation:

> [T]he remittance advices are critical as they document the proper payments that should be made from the respective programs. Moreover, a fundamental principle of the [Medicare] program is that payment be fair to the providers, the 'contributors to the Medicare trust fund' and to other patients. In this instance the program is reasonably balancing the accuracy of the bad debt payment and the timing of when these bad debts can be paid and the need to ensure the fiscal integrity of the Medicare funding, with the providers['] claims for payment which can be made under two different program[s] for which Medicare is the payor of last resort.

*Admin. R.* at 20. The Court has already concluded that the administrative opinions upon which the Secretary relied in reaching this position are "neither inconsistent

with promulgated regulations, nor outside of the coverage of the Act," *Visiting Nurse Ass'n*, 447 F.3d at 76.

This leaves MMC with the onerous burden to show that such reasoning "fails to pass muster under the reasonableness standard." *South Shore*, 308 F.3d at 101. MMC's arguments do not address these broader considerations for the must-bill policy. Again, allowing hospitals to be reimbursed for "bad debts" was not the Secretary's sole consideration in adopting the must-bill policy and applying it to MMC's claims. Instead, the Secretary properly notes that the policy is integral to her obligation to "reasonably balance" the numerous factors that she deems important in administering a "complex and highly technical program" such as Medicare. *See Visiting Nurse Ass'n*, 447 F.3d at 76. In short, the Secretary has adopted a bright-line rule based on sound considerations relating to the administration of Medicare, and she applied that rule to MMC's claims.

This Court sympathizes with the MMC's predicament. The hospital submitted its crossover claims to MaineCare, and it was MaineCare, not MMC, that failed to do its job. MMC provided hospital care to elderly people of modest means and the Secretary has never asserted that it did not. It is also true that either the federal or state government should by rights be paying the nearly three million dollars in bills that MMC issued for its treatment, but neither entity has nor appears likely to pay. Thus, the actual provider is not getting paid for reimbursable services it rendered that either or both governments in some proportion would admittedly owe had all procedural requirements been satisfied.

The policy counterargument, however, is that it is the provider, not state or federal government, that is interested in obtaining reimbursement and Medicare remains the payor of last resort. The Secretary oversees and guards payments from the federal fisc, and rather than placing the burden on the federal government to demonstrate it does not owe reimbursement, the Secretary's implementing regulations place the burden on the potential recipient of federal money to prove that it does. In this way, the Secretary's implementing requirements force Medicare and Medicaid providers—who have rendered the services, who have access to the hospital and billing records justifying them, and who have the financial incentive to obtain reimbursement—to make reasonable efforts to force the issue before they are allowed to extract money from the federal treasury. Here, the Secretary concluded—through the proxy of its must-bill policy, as opposed to a narrow individualized inquiry into the facts and equities of this matter—that MMC failed to do what it should have in pressing the issue with the state of Maine. *See Def.'s Reply* at 6 ("[P]laintiff made no attempt to take any of these actions, presumably concluding that the path of least resistance would be to bill Medicare for the entire amount of its crossover bad debt").

Nor does this Court view this dispute in a vacuum. This Court is not called upon to decide whether MMC did in fact do everything it could do to fight for reimbursement from MaineCare. It is only called upon to decide whether the Secretary's conclusion—that MMC did not comply with particular federal requirements in dealings with MaineCare regarding reimbursement for services

rendered over a decade ago—is arbitrary, capricious, an abuse of discretion, not in accordance with the law, or unsupported by substantial evidence. *Visiting Nurse Ass'n*, 447 F.3d at 72. It is under this exacting standard that MMC's claim must be judged.

The First Circuit has commented that "[c]ourts should not cavalierly discount the value of agency expertise painstakingly garnered in the administration, over time, of [administrative] programs of remarkable intricacy." *Rhode Island Hosp.*, 548 F.3d at 34 (quoting *Stowell v. Sec'y of Health & Human Servs.*, 3 F.3d 539, 544 (1st Cir. 1993)). This Court will not do so here. It finds that the Secretary's administrative decision was neither plainly erroneous nor inconsistent with the applicable regulations, and therefore affirms the administrative decision.

## IV. CONCLUSION

The Court DENIES Maine Medical Center's Motion for Judgment on the Administrative Record (ECF No. 13) and GRANTS Kathleen Sebelius's Cross-Motion for Judgment on the Administrative Record (ECF No. 14).

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 25th day of March, 2014